Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2115 | **DATE** | 2/23/2004 |
| **CASE TITLE** | Edith R. Sochet vs. United States of America | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's claim against the National Park Service is barred by the discretionary function exception of the Federal Tort Claims Act. Judgment is entered in favor of the United States.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 25 2004 | |
| | Notified counsel by telephone. | | date docketed | 19 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 2/23/2004 | |
| | | | date mailed notice | |
| ETV | courtroom deputy's initials | | ETV | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDITH R. SOUCHET, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 01 C 2115 |
| UNITED STATES OF AMERICA, | ) ) Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Edith Souchet ("Souchet") seeks damages from the United States for her personal injuries, including a broken wrist and elbow, that she suffered while visiting Fort San Cristóbol monument, part of the National Park Service's San Juan National Historic Site ("San Juan Park"), in San Juan, Puerto Rico. Souchet has filed this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680. The Government asserts that Souchet's claim is barred by the discretionary function exception to the FTCA. Alternatively, the Government asserts that Souchet's claim fails under Puerto Rico's common law of negligence. For the reasons set forth below, the court enters judgment in favor of the United States.

FEB 2 5 2004

## FACTUAL BACKGROUND[1]

**Plaintiff's Injury**

On July 27, 1995, Souchet, a Chicago resident, visited the Fort San Cristóbol monument in San Juan, Puerto Rico, with her two sons, Julian Benitez ("Benitez") and Jose "Joe" Pelegri ("Pelegri"), and Pelegri's fiancé. (Testimony of Souchet.) When the group arrived at the monument after a four-hour drive from their accommodations in Puerto Rico, the weather was cloudy and rainy. (Id.) Souchet was wearing pants, a shirt, and leather gym shoes with a rubber

---

[1] The facts are based on testimony presented at a bench trial and deposition transcripts submitted by the parties without objection.

tread. (*Id.*)

Souchet and Benitez entered the Fort, while Pelegri and his fiancé went to a nearby store to purchase umbrellas. (*Id.*) According to Madeline Yoran, San Juan Park Management Assistant, a large (3' x 4') sign stands at the entrance to the Fort, posting the hours of operation and warning visitors of slippery ramps and surfaces. (Testimony of Madeline L. Yoran; Def. Trial Exhibit 1.) Although literature and maps were available at the ranger contact station, located near the entrance, (Testimony of Yoran), neither Souchet nor Benitez received any such items nor were any staff posted at the entrance.[2] (Testimony of Souchet and Benitez.) After entering the Fort, Souchet and Benitez walked up stairs to the second level and remained there approximately 25 minutes, enjoying the ocean view. (Testimony of Benitez; Testimony of Souchet.) While on the second level, Souchet and Benitez had no contact with any Fort employees, nor did they see any warning signs, safety cones, or barricades on the monument. (Testimony of Souchet; Testimony of Benitez.) According to the park ranger on duty, David Bocanegra ("Bocanegra"), however, there were cones out that day, as noted in an incident report Bocanegra prepared later that day. (Bocanegra Dep., at 16-17[3]; Defendant's Trial Exhibit 11.) After about 25 minutes on the second level, it began to rain harder, so Souchet and Benitez decided to return to the first level and find out whether Pelegri and his fiancé had located an umbrella. (Testimony of Souchet.)

Souchet and Benitez had climbed a flight of stairs on their way up to the second level, but to return to the ground level they chose to walk down a ramp, within an enclosed tunnel, known to monument employees as "Tunnel Number 10." (Testimony of Benitez; Testimony of Paul Hartwig.)

---

[2] The literature available at the ranger's station consisted of a self-guided map of Fort San Cristóbol, which included a safety message to use extreme caution on the ramps and stairs. (Testimony of Yoran.)

[3] Depositions of Dr. Richard Sidell, Dr. Mark Schoot, David Bocanegra (Ranger in 1995); Angel Diaz (Chief of Maintenance in 1995); and Karen Spoon (Budget Analyst and member of Safety Committee in 1995) were submitted by the parties without objection. Therefore, these depositions are included in the court's review of the evidence.

2

Souchet testified that it was dark and slippery in the tunnel. As she and her son walked down the ramp, Souchet steadied herself by placing her left arm on the wall of the tunnel, and Benitez held her right arm. (Testimony of Souchet.) Approximately halfway down the ramp, Souchet's right leg slipped out from beneath her and she fell. Attempting to brace herself, Souchet broke her left wrist and elbow and experienced pain in her back and neck. (*Id.*)

Souchet and Benitez made their way out of the ramp, where Pelegri and his fiancé met them and assisted Souchet to the ranger's office. (*Id.*) Bocanegra, the ranger on duty, gave Souchet an ice pack, and at Souchet's request, called an ambulance. (*Id.*) After some delay, Souchet was transported by ambulance to the hospital, where her arm and wrist were x-rayed and put into a cast. (*Id.*)

Bocanegra completed an incident report on the day of Souchet's fall. (Defendant's Trial Exhibit 11.) In that report, Bocanegra noted that he administered first aid and recommended professional medical assistance at the nearest hospital. (*Id.*) He encouraged Souchet to drive to the closest hospital, but she preferred to wait for an ambulance, despite being warned that the municipal ambulance was unavailable and that a private ambulance would be more costly. (*Id.*) The report notes that while they waited for the ambulance, Souchet told her son she had been concerned that her tennis shoes were slippery. (*Id.*) The report states, further, that because it had been raining the entire day, yellow cones had been placed on the ramps to warn visitors to exercise caution. (*Id.*)

Souchet remained in Puerto Rico until November, by which time her cast had been removed. (Testimony of Souchet.) On her return to Chicago, Souchet sought medical treatment at Northwestern Memorial Hospital and underwent physical therapy. (*Id.*) She has been treated by two doctors in Chicago, one of whom is an orthopedic surgeon. (*Id.*) Some pain remains today in Souchet's left wrist and elbow when she does housework and lifts heavy items. (*Id.*) Although she seeks recovery for pain and physical limitations in this lawsuit, Souchet acknowledges that she

3

has been receiving Social Security disability benefits since 1994 and that she was unable to do her own housework without assistance even before the trip to Puerto Rico. (Cross-Examination of Souchet.)

**Fort San Cristóbal**

The San Juan Park is maintained by the United States National Park Service ("Park Service") and includes three separate forts ("San Juan Forts"). (Testimony of Hartwig.) Fort San Cristóbal, one of the San Juan Forts, is one of 18 World Cultural Heritage Sites located in the United States.[4] The San Juan Forts include some structures that date as far back as 1539. (*Id.*) Construction of Fort San Cristóbol officially commenced in 1625. (*Id.*) The Fort was completed in 1789 to protect the interests of the Spanish colonial empire in the Caribbean. (*Id.*) Park employees perform constant maintenance on the San Juan Forts, and, despite their age, they remain in excellent condition. (*Id.*)

The Park Service has issued general guidelines for park employees to follow regarding safety of park visitors and preservation of the park and the monument. (*Id.*) Paul Hartwig, then superintendent of the San Juan Park, explained that the guidelines require preservation of the resources in perpetuity for future generations. (*Id.*) The Park Service does not generally make day-to-day operating decisions in the specific parks, nor does the Park Service have specific safety policies for each park to follow. (*Id.*) Instead, employees at each park make safety decisions, balancing safety concerns against the goal of preservation of historic park resources. (*Id.*) Hartwig testified that if a proposed safety measure will destroy the integrity of the monument, the preservation of the monument must prevail. (*Id.*)

The San Juan Forts do contain some safety equipment. Specifically, park employees have installed handrails in two tunnels where rainfall makes passage particularly slippery and hazardous.

---

[4] *See* http://whc.unesco.org/heritage.htm

(*Id.*) Hartwig determined that a handrail was not necessary in Tunnel Number 10, however, because rainwater rarely seeps into that tunnel. (*Id.*) Furthermore, according to Hartwig and San Juan Park Management Assistant Yoran, the only reported accident in Tunnel Number 10 is the one that resulted in this action. (Testimony of Hartwig; Testimony of Yoran.)[5] Yoran noted that Park Service staff do place yellow or orange safety cones at the monument on rainy days, a measure considered less intrusive than permanent handrail installations. Placement of cones on a rainy day is not mandatory, however; instead, the park ranger on duty makes a decision whether cones are necessary for safety based on each day's conditions. (Testimony of Yoran.)

## DISCUSSION

On March 28, 2001, Souchet brought this lawsuit under the FTCA, seeking damages for the injuries she suffered at Fort San Cristóbol. On its face, the FTCA is a "broad waiver" of the United States' sovereign immunity, *Grammatico v. United States*, 109 F.3d 1198, 1200 (7th Cir. 1997), but there are several important exceptions to the government's susceptibility to suit. 28 U.S.C. § 2680; *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992); *United States v. Gaubert*, 499 U.S. 315, 322 (1991). The Government asserts that it is protected here by one such exception–the discretionary function exception. 28 U.S.C. § 2680(a); *Grammatico*, 109 F.3d at 1200. Alternatively, the Government observes that the United States, including the Park Service, is liable under the FTCA only to the extent a private property owner would be liable under the substantive law of the state where the accident occurred. 28 U.S.C. § 1346(b)(1). Here, the Government argues, the evidence does not support a finding of liability under Puerto Rico law. The court first addresses the discretionary function exception, then briefly addresses Souchet's claim under applicable Puerto Rico law.

---

[5] Bocanegra testified that he had been involved in an incident in Tunnel Number 10 in which a woman had fallen when it was not raining and had broken her ankle. (Bocanegra Dep., at 21.) Hartwig and Yoran were apparently not aware of this incident.

5

I.    **Discretionary Function Exception**

The discretionary function exception provides that the Government is not liable for

> an act or omission of an employee of the Government . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*

28 U.S.C. § 2680(a) (emphasis added). Whether the discretionary function bars this suit turns on two factors. *Grammatico*, 109 F.3d at 1200. First, the act for which liability is sought must be discretionary; that is, the challenged act must involve "an element of judgment or choice." *Id.*, quoting *Gaubert*, 499 U.S. at 322. Second, the action must be the kind of discretionary function the exception "was designed to shield." *Id.*, quoting *Gaubert*, 499 U.S. at 322. The discretionary function exception only covers "governmental actions and decisions based on considerations of public policy." *Id.*, quoting *Gaubert*, 499 U.S. at 323.

In *Gaubert*, plaintiff, the chairman of the board and largest shareholder in an insolvent federal savings and loan, ("S&L") alleged that the Federal Home Loan Bank Board, and the Federal Home Loan Bank Dallas were negligent in supervising the directors and officers of the S&L. 499 U.S. at 318-19. The Court held that the plaintiff could not prevail under the FTCA because federal regulators exercised discretion in supervising the FSLA's operations, in furtherance of public policy goals. *Id.* at 325. Similarly, in *Grammatico*, the plaintiff filed a negligence action under the FTCA for injuries from a machine his employer purchased at a Department of Defense surplus property auction. 109 F.3d at 1200. The Seventh Circuit concluded that the Department was shielded from liability because the Department had substantial discretion concerning the disposition of its surplus property and its decision to do so by public auction on an "as is" basis fell within that discretion. *Id.* at 1202-03.

The court considers here whether the acts Plaintiff Souchet challenges were discretionary and whether the Park Service's exercise of that discretion was based on public policy concerns.

6

The question of whether a challenged act is discretionary turns on the nature of the conduct, not the status of the actor. *Gaubert*, 499 U.S. at 322 (citation omitted). An act is not discretionary if a "federal statute, regulation, or policy *specifically* prescribes a course of action for an employee to follow." *Id.*, citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988) (emphasis added). In order for her claim to fall outside the "discretionary function" exception to the FTCA, Souchet has the burden of demonstrating that the safety decisions she challenges involved no "element of judgment or choice." *Elder v. United States*, 312 F.3d 1172, 1176-77 (10th Cir. 2002) (citation omitted).

The court considers, first, what conduct (act or omission) allegedly caused the harm. *Shansky v. United States*, 164 F.3d 688, 690-91 (1st Cir. 1999). Souchet asserts that Park officials knew the ramp was dangerous and did not take specific safety measures to prevent this danger. Specifically, she asserts that Park staff (1) failed to warn her that the ramp was slippery, (2) failed to place warning cones at the entrance to the ramp, and (3) failed to install safety devices such as a handrail or rubber mat at the ramp entrance. In *Shansky*, a case on all fours with this one, the plaintiff made similar arguments when she tripped and fell on an antique wooden threshold at the Hubbell Trading Post, a National Historic Site in Ganado, Arizona. *Id.* at 690. The Post had been constructed in the 1800s and was rehabilitated in 1970 by the National Park Service ("NPS") with a view toward preserving authenticity of the original structure. *Id.* Plaintiff argued that NPS was negligent in failing both to install a handrail and to post adequate warning signs in the location where she fell. *Id.* The First Circuit affirmed summary judgment in favor of the Government, reasoning that NPS had exercised discretion in balancing human safety against historic authenticity. *Id.* at 691. The plaintiff argued that Park officials' discretion was cabined by federal regulations prescribed the proper course of action for Park officials; she referred specifically to the NPS's operating manual which set forth general guidelines concerning safety. *Id.* In the court's view, however, that document demonstrated that NPS had discretion to balance safety concerns

7

against the goals of historic preservation and authenticity. *Id.* Such concerns, the court concluded, fell easily within the rubric of public policy. *Id.* at 695.

*Elder*, another case involving injuries from a fall in a national park, is similar. In *Elder*, a 12-year-old boy died while attempting to cross a small stream at Zion National Park when he left a trail, slipped on slick algae growing on a streambed, and fell over a ledge. 312 F.3d at 1174-75. Signs warning of danger and identifying the path were posted, but no sign specifically warned visitors about the danger of algae in the stream, nor were there any barriers or guardrails to prevent visitors from leaving the trail, despite the fact that three previous deaths had occurred in the same area of the park. *Id.* The court noted that after each previous fatality, an official inquiry had been conducted, safety measures were evaluated, and additional measures were considered. *Id.* at 1175. The court concluded that the Park officials' safety determinations fell within the discretionary function exception to the FTCA. *Id.* at 1180. Plaintiffs argued there that an NPS publication ("NPS-50") and two Zion publications dictated a specific course of action with respect to safety concerns, thereby defeating the "discretionary function" exception, but the court disagreed. In the court's view, the NPS-50

> certainly conveys the message that safety must be a priority, and it assists park management by focusing on a number of elements that should be encompassed by a safety program. But it does not dictate what actions park employees must take in response to particular problems. Indeed, the following language in the NPS- 50's Introduction makes clear that safety decisions must be made in the special context of a national park and that park management retains substantial discretion: . . . "[E]ach area must design its own safety and occupational health effort based on local circumstances and operations."

*Elder*, 312 F.3d at 1178, quoting NPS-50, Introduction, at iii (Jan. 1991). Having found that Park officials exercise discretion as to placement of warnings and barriers at the accident site, the court had little difficulty concluding that their discretion was exercised in light of policy considerations

regarding cost, preservation, and safety. *Id.* at 1180-81.[6]

Souchet focuses on the absence of any warning cones at the entrance to Tunnel Number 10 on July 27, 1995, and argues that placement of such cones was mandatory, not discretionary. The court notes, first, that there is some dispute about whether cones were placed at Tunnel Number 10 on the day Ms. Souchet was injured. Souchet and her son did not see any such cones; Bocanegra's incident report states that warning cones were posted. For purposes of this decision, the court will assume there were no warning cones posted on July 27, 1995. The United States argues that whether and when warning cones were posted was a matter within the Park officials' discretion. Souchet herself admits there was no written policy concerning cones; she relies, instead, only on the testimony of certain witnesses that use of cones when it rains is typical or customary. Notably, no witness testified that cones were mandated.[7] To the contrary, Paul Hartwig, then-superintendent of San Juan Park, testified that there was no written policy concerning the use of cones, and that the individual ranger on site had discretion to determine whether to use them. (Testimony of Hartwig.)

Even if Park officials had discretion over the placement of cones, Souchet argues, the Park

---

[6] Other courts, as well, have rejected the notion that National Park Service policy guidelines are so specific as to eliminate genuine discretion on the part of park officials. *See, e.g., Blackburn v. United States*, 100 F.3d 1426, 1434 (9th Cir. 1996); *Shansky*, 164 F.3d at 693-95. Although Plaintiff makes essentially the same argument here, she has not specifically identified any specific statute, regulation, or guideline that limits the discretion claimed by San Juan Park officials.

[7] Facilities Manager Angel Diaz testified that he was unaware of no instance in the previous seven years when it was raining and the cones were not used. (Diaz Dep., at 10.) When asked whether "every time it rains cones go out immediately," Diaz responded, "Right." (*Id.*) Bocanegra testified that the person on duty was in charge of placing cones and that it was the *custom* to put cones out each time it rained. (Bocanegra Dep., at 6, 16.) In *Shansky*, the plaintiff pointed to other steps NPS took to make the Trading Post safe and argued that these safety decisions obliged the Park Service to implement similar safety measures at the location of the injury. 164 F.3d at 688. The court rejected this argument, noting that the Guidelines gave park service officials discretion to make precisely these kinds of judgments. *Id.* Like the plaintiff in *Shansky*, Souchet presents no evidence of a Park Service policy *mandating* warning cones; rather, the witnesses' testimony merely describes the typical practice.

9

Service's general responsibility to ensure visitor safety was not a matter of discretion. Significantly, however, she contends not that the Government ignored safety concerns, but that the measures adopted were insufficient. In this court's view, Souchet's argument that a number of safety measures would have been desirable defeats her contention that Park Service officials had no choice concerning safety issues. Testimony of the government's witnesses establishes that the overall safety determination made by the superintendent at San Cristóbal involved, in the Supreme Court's words, "an element of judgment or choice." *Gaubert*, 499 U.S. at 322. Hartwig's testimony confirms this conclusion. Hartwig explained that as superintendent at San Cristóbol, he ultimately decided what safety measures to take, always balancing the safety of employees and visitors against the central objective of preservation of the historic structure in its original state. Personnel in the Park Service's regional office in Atlanta were available for consultation, but the on-site superintendent made final decisions concerning safety issues. Angel Diaz, a facilities manager at the Fort, noted that maintenance staff were required to obtain a permit from the superintendent before installing any permanent safety measures, such as handrails, at the facility. (Diaz Dep., at 12-13.)

Even if she were to concede that Park officials' safety decisions were discretionary, Souchet might argue that they are nevertheless insufficient to bar her suit unless those decisions are based on policy considerations. See *Berkovitz*, 486 U.S. at 537 (discretionary function exception "protects only governmental actions and decisions based on considerations of public policy"). Such an argument would have little traction here. As the *Gaudert* Court explained, when government policy authorizes an official to exercise discretion, there is a presumption that the official's decisions are grounded in policy. 499 U.S. at 324. In creating the Park Service, Congress provided:

> The service thus established shall promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . as provided by law, by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the

enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1.

The court understands this statute as a clear expression of a policy to preserve historical structures like Fort San Cristóbol. Therefore, the court presumes that the determinations regarding specific safety measures were grounded in the public policy consideration of conservation. In *Elder*, the Tenth Circuit held that safety determinations in the national parks are policy decisions. 312 F.3d at 1181 (observing that the propriety of "any safety measure must be weighed against damage to natural resources and aesthetic values"). The *Shansky* court, likewise, noted that "[a]esthetic considerations, including decisions to preserve the historical accuracy of national landmarks, constitute legitimate policy concerns." 164 F.3d at 693. This court agrees.

In fact, Souchet does not expressly challenge the existence of a public policy in favor of preservation, but rather urges that the Park Service could have taken safety measures that would not have interfered with that goal. For example, according to Souchet, NPS could have installed a handrail on the wall of Tunnel Number 10, provided additional lighting, or furnished rubber mats. In response, Paul Hartwig explained that before taking any safety measure, he would consider the effect on the public policy goal of preservation. With respect to Tunnel Number 10, Hartwig observed that it did not ordinarily become as slippery as other areas at the Fort; that because it was covered, the ramp usually stayed dryer; and that he was unaware of any other serious incident there. In Hartwig's view, installation of handrails would have constituted a major alteration of the authenticity of the Fort's historic structure; such measures were taken in other parts of the Fort only after significant consideration of the additional hazards there.[8] In weighing the cost of safety

---

[8] The fact that particular safety measures are used in other parts of the park does not bolster Plaintiff's claim because "a commitment to safety in one area does not oblige an agency to strike the balance in favor of safety in every other area." *Shansky*, 164 F.3d at 695.

11

measures against the additional benefit, Hartwig noted that he considered rubber mats to be potentially more hazardous, and difficult for the staff to utilize. Souchet challenges the wisdom of Hartwig's decisions, but the law is clear that neither her assessment of the propriety of safety measures, nor that of this court, is a relevant consideration in determining the availability of the discretionary function exception to liability under FTCA. See *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 815 (1984) (recognizing Congressional intent underlying the discretionary function exception to FTCA: to prevent judicial "second-guessing" of administrative decisions grounded in policy).

The court concludes that park officials' decisions regarding safety features at Fort San Cristóbol were clearly based on public policy considerations. For these reasons, Souchet's action is barred by the discretionary function exception to government liability under FTCA.

## II. Negligence

The Government argues that even if the discretionary function exception does not apply, the court should enter judgment in favor of the United States because Souchet is unable to demonstrate negligence under Puerto Rico law. Although the discretionary function exception is dispositive here, the court will address Souchet's negligence claim briefly. Under FTCA, the court must apply the substantive law of the place of the incident, in this case, Puerto Rico. 28 U.S.C. § 1346(b)(1); *Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003). Had it occurred on private property in Puerto Rico, Souchet's injury would arguably be covered by Article 1802 of the Puerto Rico Civil Code, which provides: "A person who by an act or omission causes damage to another through fault or negligence shall be obligated to repair the damage so done." 31 L.P.R.A. § 5141 (2002). To establish her claim, Souchet must prove that: (1) there was a negligent act or omission, (2) she suffered damages, and (3) there was a causal relation between her damages and the negligent act or omission. *Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 321 (1st Cir.

1999) (collecting cases). "Not all actions or omissions which result in injuries/damages will give rise to liability under art. 1802," however. *Id.* Instead, Souchet would prevail only if she could demonstrate that the Government failed to exercise due diligence to avoid foreseeable risks. *Id.* It is clear that the duty of care imposed upon the Government is to anticipate reasonably probable injuries to probable victims. *Id.* at 322. "The foreseeability contemplated by the statute does not include every conceivable consequence of an act or omission since to do so would make the defendant an absolute insurer." *Id.*

Souchet made no specific reference to Puerto Rican tort law, but as the court understands her claim, Souchet contends that the Park Service was negligent in not warning her that Tunnel Number 10 could be slippery and in failing to take all necessary steps to prevent her from falling. As discussed above, the Government presented evidence that there was a large sign at the entrance of the Fort clearly visible to all visitors, and that brochures were available that included a warning that the Fort was slippery. Souchet and her son testified that they did not see the sign, did not obtain a brochure, and were never advised concerning safety by a ranger or park official. The parties dispute whether warning cones were utilized that day. The court concludes, regardless, that the warnings were adequate. Souchet herself testified that it was raining the entire time she visited, that she was aware of the need for caution, and that she leaned on her son and rested her hand on the wall of the tunnel for support when she fell in the tunnel. The court finds that Souchet had actual knowledge of the conditions and finds no basis to conclude that she would have taken other precautions had she been warned of the dangers.

Apart from the failure to warn, Souchet argues more vigorously that the Park Service did not take all measures necessary to assure that she would not be injured. As stated in *Irvine*, the Park Service is not an "absolute insurer" for all visitors. 194 F.3d at 322. Souchet specifically argued that additional measures like handrails, rubber mats, and better lighting would have prevented her fall. Although Souchet testified that the tunnel was dark, her son testified that the

13

tunnel was medium- to well-lit. There was no evidence that rubber mats would have prevented her fall; to the contrary, Hartwig testified that one of the reasons mats were not used is that they can become more slippery when wet. Souchet believes that a more stable support, like a handrail, could have prevented her fall, but the court notes that Souchet was already using the wall and her son for support, and though a handrail possibly could have been more stable, there was no evidence that it would have prevented her fall. Furthermore, the Government presented consistent testimony of Fort San Cristóbol employees that Tunnel Number 10 was not regarded as slippery or unsafe. Puerto Rico's negligence law does not place the responsibility for all injuries on the alleged tortfeasor, 194 F.3d at 321, and the court concludes Souchet has not met her burden of proof on this issue.

The court finds, therefore, that even if the discretionary function exception did not apply, the Government would not be liable under Puerto Rico negligence law.

## CONCLUSION

Plaintiff's claim against the National Park Service is barred by the discretionary function exception of the Federal Tort Claims Act. Judgment is entered in favor of the United States.

ENTER:

Dated: February 23, 2004

REBECCA R. PALLMEYER
United States District Judge

14